IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:07-CV-74-DCK

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, )<br>RUBBER, MANUFACTURING, ENERGY, )<br>ALLIED-INDUSTRIAL AND SERVICE )<br>WORKERS INTERNATIONAL UNION, )<br>AFL-CIO-CLC and its LOCAL NO. 850L, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CONTINENTAL TIRE NORTH AMERICA, )<br>INC., CTNA HEALTH PLAN, PENSION )<br>PLAN FOR HOURLY-PAID EMPLOYEES )<br>OF CONTINENTAL GENERAL TIRE, INC. )<br>And CERTAIN AFFILIATED COMPANIES, )<br>)<br>Defendants. )<br>_____)| **ORDER** |

**THIS MATTER IS BEFORE THE COURT** on Plaintiffs' "Motion For Summary Judgment..." (Document No. 22) and "Plaintiffs' Brief In Support Of Their Motion For Summary Judgment On Count I Of The Complaint" (Document No. 23), filed September 10, 2007; "Defendants'...Motion For Summary Judgment" (Document No. 24) and "Defendants' Memorandum Of Law In Support..." (Document No. 25), filed September 10, 2007; "Plaintiffs'...Responsive Memorandum In Opposition To Defendants' Motion For Summary Judgment" (Document No. 32), filed October 24, 2007; "Defendants' Response In Opposition To Plaintiffs' Motion For Summary Judgment" (Document No. 33), filed October 24, 2007; "Plaintiffs'...Reply To Defendants' Response In Opposition To Plaintiffs' Motion For Summary Judgment" (Document No. 34), filed November 1, 2007; and "Defendants' Reply Memorandum In Support Of Their Motion For Summary Judgment" (Document No. 35), filed November 1, 2007.

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are ripe for disposition.

Having carefully considered the papers, the record, the applicable authority, and the arguments of counsel at a motions hearing on January 29, 2008, the undersigned will grant Plaintiffs' motion and deny Defendants' motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Continental Tire North America, Inc. ("CTNA" or "the Company" or collectively with Health Plan and Pension Plan, "Defendants"), is a group company of Continental AG ("Continental"), an international manufacturer and supplier to the automotive industry based in Hanover, Germany. The Company manufactures, markets, and distributes passenger car, light truck commercial and off-road tires under the "Continental" and "General" tire brands. The Company operates a manufacturing plant in Charlotte, North Carolina, which prior to the production curtailments giving rise to this dispute employed about 1,250 employees. Defendant Health Plan and Pension Plan are employee benefit plans sponsored by Defendant CTNA and sued by Plaintiff as parties pursuant to Rule 19 of the Federal Rules of Civil Procedure.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, AFL-CIO CLC, on behalf of its Local No. 850L (collectively "the Union" or "Plaintiffs") is the collective bargaining representative for bargaining unit employees at the Company's plant in Charlotte. The Union and the Company were parties to a collective bargaining agreement ("CBA") and a Pension and Insurance Agreement ("P&I Agreement") effective September 20, 1999 through April 30, 2006.

On October 20, 2005, the Company notified the Union of its need to reduce costs at the Charlotte plant and advised the Union that significant changes would need to be made to the CBA to achieve necessary cost reductions. The Company informed the Union that unless the parties reached an agreement by the end of 2005, it would be forced to implement production curtailments in 2006 that could result in the layoff of hundreds of employees. The parties failed to reach an agreement by the end of 2005.

On January 9, 2006, the Company complied with the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*, ("WARN") and gave notice of intent to implement a two-phase production curtailment at the Charlotte plant.[1] On February 15, 2006, the Company gave notice of its intent to terminate the CBA and P & I Agreement on their expiration date of April 30, 2006. On March 10, 2006, the Company issued a second WARN notice and informed the Union of its plans for a three phase production curtailment, culminating in the "indefinite suspension" of tire production. The Company also informed the Union that it was not intending to discontinue all operations at the plant - approximately 200 employees would be retained. On March 17, 2006, in the first of the previously announced curtailments, 124 employees were laid off.

The CBA and P & I Agreement expired on April 30, 2006. The Company informed the Union that it believed the parties were at an impasse. On May 1, 2006, the Company unilaterally implemented terms of a Last, Best, and Final Proposal ("Implemented Terms") that did not include arbitration in the grievance procedure. On May 8, 2006, the Company issued a third WARN notice. On May 12, 2006, approximately 166 workers were laid off.

---

[1] "An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order...." 29 U.S.C. § 2102 (a).

The Union submitted two grievances it claims to be "in accordance with the dispute resolution procedure recognized in the P&I Agreement" on August 9, 2006. The grievances contend that the Company failed to provide "the contractually required amount of pension to which employee Arnold Huffstetler and other employees are entitled as a result of the permanent discontinuance of operations" pursuant to "Section IX, [5(A) i, ii, iii] [4(A) i, ii, iii]" of the P&I Agreement, and the "contractually required insurance benefits to which employees are entitled as a result of the permanent discontinuance of tire making operations" pursuant to "Section III, ¶ H of the P&I Agreement." (Document No. 23 at 4), (Document No. 1-11). Specifically, these claims involve provisions for insurance and benefits for twenty-four (24) months for employees who are terminated due to a discontinuance of operations or plant closure and pension benefits contingent on the Company's discontinuance of operations or plant closure and upon the employee's years of vesting service, or age and years of service. (Document No. 23 at 4-5).

According to Defendants, upon receipt of the grievances, the Company's Human Resources Manager at the Charlotte plant, Rick Schultheiss, informed a Union representative "that these grievances were not arbitrable under the Implemented Terms or the P&I Agreement." (Document No. 25 at 10).[2]

On September 15, 2006, the Company implemented its previously announced "indefinite suspension" of tire production.

---

[2] "Defendants' Memorandum Of Law..."(Document No.25) does not precisely reflect the "Declaration of Rick Schultheiss ¶¶ 4-5" (Document No. 27) it cites. Mr Schultheiss' declaration states that the "grievances were not arbitrable under the current grievance procedure" and does not reference either the Implemented Terms or the P&I Agreement as Defendants suggest.

4

On February 14, 2007, the Union filed its "Complaint To Compel Arbitration" (Document No. 1). The Complaint includes two counts: "Count I: Action to Compel Arbitration" and "Count II: Action For Breach of Contract...." (Document No. 1). By "Order" (Document No. 21) on August 20, 2007, the undersigned determined that the Court would bifurcate Counts I and II and stay all discovery in this case pending a decision on Count I. The parties filed their cross motions for summary judgment (Document Nos. 22 and 24) on the issue of arbitration on September 10, 2007.

## II.  STANDARD OF REVIEW

The standard of review here is familiar. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As this Court has previously explained,

> Defendant as the moving party has the initial burden to show a lack of evidence to support Plaintiff's case. If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]."

Boggan v. Bellsouth Telecomms., Inc., 86 F.Supp. 2d 545, 547 (W.D.N.C. 2000) (citations omitted).

The non-moving party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but his response ... must set forth specific facts showing there is a genuine issue for trial. Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, the court

5

views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

### III. DISCUSSION

The Federal Arbitration Act ("FAA") "embodies the national policy favoring arbitration" and provides in pertinent part:

> A written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 1207 (2006); 9 U.S.C. § 2 (2008); see also, Preston v. Ferrer, 128 S.Ct. 978, 981 (2008). "Congress has thus mandated the enforcement of arbitration agreements." Southland Corp. v. Keating, 465 U.S. 1, 10 (1984).

The question for this Court in the instant case is whether the dispute between the parties is arbitrable. See Cumberland Typographical Union No. 244 v. The Times and Alleganian Company, 943 F.2d 401, 404 (4th Cir. 1991). If it is, then the Labor-Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, "allows the specific enforcement of the arbitration agreement." Id.

Following guidance from the Supreme Court, the Fourth Circuit Court of Appeals recognizes four principles in determining whether a labor dispute is arbitrable. Id.

> Under the first principle, the parties must have contracted to submit the grievance to arbitration. The second principle requires that the court determine whether the contract provides for arbitration of the particular grievance in question. The third principle demands that the court not decide the merits of the grievance while determining the arbitrability of the dispute. Finally, if the contract contains an

6

arbitration clause, a presumption of arbitrability arises. The court should not decline to order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

Id. (citations omitted).

The first principle requires that the parties have contracted to submit the grievance to arbitration. The parties in Article III of their P&I Agreement stipulated that:

> [i]n the event any dispute shall arise based on the question whether the Company has provided the insurance benefits hereinabove described, such dispute shall be subject to the grievance procedure of the [CBA] including arbitration..... Termination of the [CBA] shall not invalidate the use of its grievance procedure for purposes of this Section.

(Document No. 1-5 at 32). This language indicates that pursuant to the first principle the parties did indeed contract to submit grievances to arbitration.

Since the Union's grievances claim violations of the P&I Agreement, specifically "failure to provide contractually required insurance benefits" and "failure to provide the contractually required amount of pension" and the P&I Agreement's grievance procedure includes arbitration, there is a strong implication that the parties have also contracted to submit these particular types of grievances to arbitration. (Document 1-11 at 2-3). Article I, Section VI of the P&I Agreement addresses the appeals procedure and includes types of questions that would be subject to those procedures:

> (a)    the number of Years of Credited Service or Vesting Service of such Employee or Pensioner, or
> (b)    the age of such Employee or Pensioner, or
> (c)    the amount of pension or other benefit to which an Employee or Pensioner is entitled under this Agreement, or
> (d)    whether such Employee or Pensioner, if he/she shall have been determined to be permanently disabled but shall not

> have reached his/her Normal Retirement date, became permanently disabled....

(Document No. 1-4 at 31-32). Thus, the Fourth Circuit's second principle requiring that the contract provide for arbitration of the particular grievance appears to be met. At a minimum, the Union's grievances involve a dispute over an entitlement to an "amount of pension." See Article I., Section VI (1)(c) of the P& I Agreement.

In analyzing the pending motions pursuant to the Fourth Circuit's third principle, the undersigned has conscientiously avoided consideration of the merits of this case even though it is difficult at times in this case to distinguish arguments for or against arbitration from arguments on the merits. The discussion and conclusion regarding the pending motions should not be construed to represent any opinion on the merits of this case; the purpose of this Order is solely to determine whether the underlying issues are subject to arbitration.

The fourth principle explains that there is a presumption in favor of arbitration if the underlying contract includes an arbitration clause. In this case, both the P&I Agreement and the CBA reference arbitration procedures. Accordingly, applicable case law commands that the Court "should not decline to order arbitration 'unless it may be said *with positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Cumberland, 943 F.2d at 404, citing AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960)) (emphasis added). Although Defendants make very strong arguments for their position opposing arbitration, the undersigned is not satisfied that it "may be said with positive assurance" the asserted dispute is not covered by the arbitration clause.

Similar to the Cumberland case, the Company here alleges that the district court does not have jurisdiction to compel arbitration because the CBA had expired at the time the dispute arose. See Cumberland, 943 F.2d at 404; (Document No. 33 at 1-2). The Company contends that the Union's argument for the arbitration of post-expiration grievances, based on the P&I Agreement's 90 day extension of benefits, is "meritless." (Document No. 33 at 2). The Company argues that there is no support in the P&I Agreement for the idea that the Company must continue paying benefits and "also *commence* payment of accelerated benefits based on a discontinuation of tire production if that discontinuation occurs within 90 days of the termination of the agreement." Id. at 5.

The Company may ultimately prevail based on their position on the merits of the case; however, as explained above, the issue before the Court does not include the merits. The question before the Court is whether this case belongs in arbitration. The Company attempts to distinguish Cumberland by arguing that in the instant case the benefits at issue are not owed. But, the Company does not persuasively argue why that decision should not go to an arbitrator, or, whether or not arbitration itself is a "benefit" under the P&I Agreement that was extended 90 days.

The Cumberland decision, even if founded on distinguishable facts regarding the merits, provides helpful guidance for determining whether a case is arbitrable beyond expiration of an agreement. Deciding the instant case is not arbitrable would require assuming the 90 day extension of benefits does not include arbitration, and that the language in the P&I Agreement expressly stating that "[t]ermination of the [CBA] shall not invalidate the use of its grievance procedure" is not applicable to this dispute. (Document No. 1-4 at 32).

Cumberland interpreted Nolde Bros. Inc. v. Bakery & Confectionery Workers Union, 430 U.S. 243 (1977) to hold:

> that the termination of the collective bargaining agreement does not automatically extinguish the duty to arbitrate grievances which arose under that contract. A dispute "arises under" the agreement when it concerns an obligation **arguably** created by the expired agreement, so that the resolution of the claim hinges on the interpretation ultimately given to the contract clause which engendered the claim. The Court further held that the strong presumption favoring arbitrability must be negated **expressly or by clear implication** that the parties intended their arbitration duties to terminate automatically with the end of the contract.

Cumberland, 943 F.2d at 404-05 (internal citations omitted) (emphasis added).

In the instant case, it is certainly "arguable" that the obligation Plaintiffs claim Defendants owe them was created by the expired CBA and/or P&I Agreement. Arguably, the Plaintiffs' rights to the pension and health benefits they seek was created by the expired agreements and resolution of their claim hinges on the interpretation of the contract clause which engendered the claim. Furthermore, the Company has not refuted the strong presumption favoring arbitration by express or clear implication. Cumberland 943 F.2d at 405. To the contrary, the P&I Agreement expressly states that "[t]ermination of the [CBA] shall not invalidate the use of its grievance procedure." (Document No. 1-4 at 32).

The Company argues that the previously cited provision of the P&I Agreement, stating that termination shall not invalidate the grievance procedure, has no bearing on this case. (Document No. 33 at 6). It contends that the events giving rise to the grievances did not occur until after expiration of the P&I Agreement and therefore there is no basis to arbitrate, regardless of the survival of the CBA grievance procedure. Id. This argument, however, does not seem to take into account the 90 day extension of benefits, or the holding from Nolde that when a dispute arises under the allegedly

10

expired agreement, and concerns an obligation created by the expired agreement, the duty to arbitrate may not be automatically extinguished. Nolde, 430 U.S. at 249-251. "The cases interpreting Nolde have held that in order to "arise under" an expired contract, a dispute must involve rights which to some degree have vested or accrued during the life of the contract." Cumberland 943 F.2d at 405, citing Litton v. NLRB, 501 U.S. 190, 205-06 (1991).

The Company's cross motion for summary judgment (Document No. 24) focuses on three main arguments to discredit the Union's position: first, they contend that the Union's "Complaint..." (Document No. 1), filed on February 14, 2007, was time-barred by the six-month statute of limitations applicable to claims brought under Section 301 of the LMRA; second, that the Union's grievances are not arbitrable because they rely on the purported discontinuance of operations at CTNA's plant - which Defendants deny has ever occurred; and third, that the Union's grievances are not arbitrable under the plain language of the P&I Agreement. (Document No. 25 at 2).

As to the timeliness of the complaint, it is widely accepted that "an action to compel arbitration of a collective bargaining agreement under section 301 of the Labor Management Relations Act is governed by the six-month limitation included in section 10(b) of the National Labor Relations Act." Local Union 674 v. A.P. Green Refractories, 895 F.2d 1053, 1055 (5th Cir. 1990). "[T]he cause of action to compel arbitration under a collective bargaining agreement accrues when one party clearly refuses to arbitrate the dispute." Id.

In this case the Company contends that it

> made clear on August 9, 2006 that the Union's grievances seeking benefits under the P&I Agreement were not arbitrable. Specifically, upon receipt of the grievances, Rick Schultheiss, CTNA's Human Resources Manager at the Charlotte Plant, stated to the Union representative that, while he would give the grievances to CTNA's Vice President of Human Resources for a written response, CTNA

>would not agree to arbitrate grievances relating to the eligibility for benefits based upon an alleged discontinuance of operations.

(Document No. 25 at 13); see also (Document No. 27 at 2). Taking into account his declaration on September 10, 2007, there appears to be no question as to the content of Mr. Schultheiss' statement to a Union representative on August 9, 2006, only disagreement over the legal effect.

The Company contends that its August 9, 2006 statement unequivocally declared that it would not arbitrate - thus constituting notice to that affect to the Union and starting the clock on the six-month limitation period for the Union to file a suit compelling arbitration. Id. As a result, the Company's position seems to be that the Union's complaint, filed February 14, 2007, was filed five (5) days late.

The Company acknowledges that it planned to prepare a written response to the request for arbitration, but declines to mention in its briefs when that response was issued. The undersigned is uncertain whether a formal written notice from CTNA refusing to arbitrate was ever produced, although it was suggested at the January 29, 2008 hearing that there may have been such written notice on August 17, 2006. In light of Mr. Shultheiss' statement that the grievances would go to the Vice President of Human Resources for a written response, it is far from "clear" or "unequivocal" that the Company had refused to arbitrate as of August 9, 2006.

The Union also argues that Mr. Shultheiss' statement was that the "grievances were not arbitrable under the *current* grievance procedure" and thus does not amount to an unequivocal refusal to arbitrate under the P&I Agreement. (Document No. 27 at 2) (emphasis added). Arguably, in the Company's view the "current grievance procedure" on August 9, 2006, was limited to the grievance procedures of the Implemented Terms which had no arbitration provision. Therefore, it is unclear whether or not Mr. Shultheiss' response addressed the Union's grievances as drafted.

12

The Union also challenges the Company's alleged rejection of arbitration on the basis that the Union had not expressly demanded arbitration when it presented its grievances to Mr. Schultheiss on August 9, 2006. The Union contends that the grievances were initiated at Step 3 of the grievance procedure and that they still had the option to appeal the grievance to Step 4 or arbitration. (Document No. 32 at 4). Accordingly, the Union argues that Mr. Schultheiss' statement allegedly refusing arbitration was premature, frustrated the collectively bargained process for resolving grievances, and did not start the clock on the statute of limitations. Id., see also (Document No. 1-2 at 7-10).

The undersigned will decline to express an opinion as to the applicability of the six-month statute of limitations, except that it does not preclude arbitration under the circumstances of this case.

The Company's claim for summary judgment next contends, citing Litton v. NLRB, 501 U.S. 190 (1991), that because the Union's grievances did not arise until after the expiration of the CBA and the P&I Agreement the grievances are not arbitrable. The Company notes that there is no dispute that the CBA and the P&I Agreement expired on April 30, 2006. Furthermore, it argues that the Union's grievances cite portions of the P&I Agreement that require the "discontinuance of operations" to trigger benefits. (Document No. 25 at 14). It is the Company's position that operations were never "discontinued," thus the grievances are not arbitrable.

In response, the Union argues that

> [t]he Company fails, however, to cite the crucial exception recognized by the Court in Litton that, "if a collective bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions." Moreover, the Litton Court recognized a presumption, as a matter of contract interpretation, "that the parties did not intend a pivotal dispute

13

> resolution provision to terminate for all purposes upon expiration of the agreement."

(Document No. 32 at 5) (internal citations omitted). The Union further argues that according to Litton, a post-expiration grievance requires arbitration where: the underlying facts and events arose before expiration, or the action taken after expiration infringes a right that accrued or vested under the agreement, or where the disputed right survives expiration of the remainder of the agreement. Id. at 6, quoting Litton, 501 U.S. at 206. Here, the Union contends that the right to benefits accrued under the agreement and the drastic layoff of employees occurred in a time period when the benefits were explicitly continued, and therefore the right to benefits survived expiration of the agreement. Thus, the Union takes the position that its claims are subject to arbitration. The undersigned agrees that expiration of the agreement does not necessarily preclude arbitration, and finds that an arbitrator may consider this issue.

The Company also argues that the dispute is not arbitrable because the Implemented Terms, effective May 1, 2006, governed the relationship between, and the rights of, the parties - and it does not include an arbitration clause. (Document No. 25 at 17). The undersigned is unaware of any claim by the Union that its right to arbitration is supported by the Implemented Terms. Nevertheless, the Company takes the conclusory position that the Implemented Terms apply to this controversy and neglects to mention any effect of the 90 day extension of benefits under the P&I Agreement. Instead, the Company simply surmises that "the P&I Agreement's language providing for the survival of the CBA's grievance is void along with the rest of the P&I Agreement." The undersigned is not convinced the P&I Agreement was "void" based on the existence of the Implemented Terms.

The Company next argues that even if the P&I Agreement were applicable, the grievances here do not fall within the scope of the agreement. (Document No. 25 at 18-19). The Company

14

contends that the Union's grievances do not fit in any of the categories of claims identified under the "Appeals Procedure" of Article I, Section VI of the P&I Agreement and do not raise any of these issues identified by the P&I Agreement as arbitrable. (Document No. 25 at 19-20). The Company argues that the grievances essentially raise the issue of whether a "discontinuance of operations" triggered certain pension and insurance benefits. Id. at 20. The Company goes on to specifically claim that the grievances "do not raise a question of, or dispute over the amount of pension at issue." Id.

Although there is clearly a connection between the alleged discontinuance of operations and the benefits sought, as discussed above, at a minimum the grievances explicitly claim a failure to provide "the contractually required **amount of pension**." (Document No. 1-11 at 3)(emphasis added). It is difficult to ignore the plain language of the grievance and accept the Company's argument that this dispute is not about "the amount of pension or other benefit." (Document No. 25 at 20). The undersigned, therefore, cannot conclude that the Union's grievances are necessarily excluded by the P&I Agreement's appeals procedure.

Finally, the Company contends that because no employee has filed an application for benefits under the P&I Agreement, there is no issue for arbitration. It relies on ERISA cases Rodriguez v. MEBA Pension Trust, 872 F.2d 69, 72 (4th Cir. 1989) and Doe v. Blue Cross Blue Shield of Maryland, 173 F.Supp. 2d 398, 407 (D.Md. 2001) for support. The Union counters that because this suit was filed under Section 301 of the LMRA the relevant issue is whether the Union and the Company agreed to arbitrate disputes. The Union contends that whether or not an application for benefits must be filed first is a procedural issue to be determined an arbitrator. The Union cites Howsam v Dean Witter Reynolds, Inc., 537 U.S. 79, 85 (2002) and John Wiley & Sons, Inc. v.

Livingston, 376 U.S. 543, 557 (1964) in support of its position. The undersigned will adopt the Union's position that under these circumstances, this question should be resolved through arbitration.

## IV. CONCLUSION

The undersigned has avoided making a determination based on the parties' positions on the merits of their respective cases regarding an alleged breach of contract. Although the Company makes some interesting and compelling arguments, it is the undersigned's view that questions such as whether an application for benefits must be denied before there can be arbitration, what is meant by "amount of pension," and how to define "discontinuance of operations" - should in this case first be presented to an arbitrator. In sum, this case involves parties who had agreed to settle their disputes within a procedural process including arbitration. Defendants here have failed to persuade the Court that "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Cumberland, 943 F.2d at 404. Furthermore, there does not appear to be a genuine issue of material fact on the issue of arbitrability; rather, the parties seem to agree on the basic facts, but dispute the proper application of the law. Because the undersigned cannot say with "positive assurance" that the underlying dispute is not covered by the arbitration provisions in the parties' agreements, and recognizing a national policy favoring arbitration, the undersigned will find that this matter should be subject to arbitration.

**IT IS, THEREFORE, ORDERED** that Plaintiffs' "Motion For Summary Judgment..." (Document No. 22) is **GRANTED** and "Defendants'...Motion For Summary Judgment" (Document No. 24) is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **STAYED** pending the outcome of arbitration. The parties, jointly if possible, shall file a report with this Court within fourteen (14)

days of a decision by the arbitrator; and that report shall include a discussion of the impact of the arbitration on the federal lawsuit, identify the issues remaining to be litigated, and set forth a proposed discovery plan.

**SO ORDERED**.

Signed: June 12, 2008

David C. Keesler
United States Magistrate Judge